JL

WO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Calvin Clinton Ward,

Plaintiff,

v.

David Shinn, et al.,

Defendants.

No.   CV-22-00998-PHX-JAT (JZB)

**ORDER**

Pro se Plaintiff Calvin Clinton Ward, who is currently confined in the Arizona State Prison Complex-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc-2000cc-5.   Defendants former Arizona Department of Corrections, Rehabilitation and Reentry (ADC) Director David Shinn and Chaplains Kenneth Herman, Adam Henry, and Trever McShane move for summary judgment on exhaustion grounds, as well as the merits of Plaintiff's First Amendment religious exercise, RLUIPA, and Fourteenth Amendment equal protection claims.  (Doc. 45.)  Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 49), and he opposes the Motion.  (Doc. 50.)  Defendants filed a Reply.  (Doc. 59.)

The Court will deny the Motion for Summary Judgment.

## I.    Background

In the Complaint, Plaintiff alleges that Defendants violated his rights by denying his requests to grow a full-length beard with no length restriction, to participate in group

worship and group study, and to possess various religious items.  (Doc. 1.)  On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a RLUIPA claim, a First Amendment religious exercise claim, and a Fourteenth Amendment equal protection claim against Defendants Shinn, Herman, Henry, and McShane and directed Defendants to respond to the Complaint.  (Doc. 6.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

**III.    Facts**

    **A.    Odinism/Asatru**

Plaintiff began studying the religion mostly known today as Asatru approximately 39 years ago.  (Pl.'s Controverting Statement of Facts (PCSOF), Doc. 51 at 2 ¶ 16a.) Plaintiff is an official member of the Asatru Religious Community and a recognized member of the Might of Mjollnir Kindred.  (*Id.*)  Plaintiff's religious preference was Asatru in 1998 or 1999, but Asatru was not recognized as a religion by the ADC Chaplaincy until 2003.  (*Id.* ¶ 16.)  In April 2020, Plaintiff changed his religious preference to Odinist.  (Doc. 46-7 at 3.)

Odinism is not a rigidly structured religion in the sense that it lacks a "holy text" such as the Bible, Koran, or Torah.  (PCSOF ¶ 19c.)  Odinists rely on "lore" in the form of myths, sagas, and eddas; historical, legal, and medical texts; as well as modern archaeological, linguistic, and anthropological research, to ensure that their practices are as logically consistent with the practices of their ancestors as possible.  (*Id.*)  Odinists also rely upon "Unverified Personal Gnosis"—personal experiences and spiritual epiphanies that that are very powerful on an individual level but are "completely unverifiable."  (*Id.*) The study and practice of Odinism is an "intensely personal experience and most Odinist practitioners form religious views that differ from those held by practitioners of the same faith."

    **B.    Relevant ADC Policies**

ADC Department Order (DO) 704, Inmate Regulations, provides, "Full beards or goatees up to one inch in length are allowed, and shall be kept clean, trimmed and well-groomed at all times. Partial beards such as Fu Manchu or Vandyke styles shall not be authorized."  (Doc. 46-2 at 5.)  DO 803, Inmate Disciplinary Procedure, specifies that failure to maintain grooming requirements is a Class C violation that subjects a prisoner to loss of privileges and extra duty.  (Doc. 51 at 12-13.)

DO 904, Inmate Religious Activities/Marriage Requests, requires Wardens and Deputy Wardens to "[p]rovide the necessary security staffing for religious activities." (Doc. 46-1 at 4.)  "When a religious leader of an inmate's faith is not represented through the chaplaincy staff or volunteers, the unit Chaplain(s) shall assist the inmate in contacting a person who has the appropriate credentials from the faith judicatory."  (*Id.* at 5.)

"Regular worship/study opportunities shall be provided for faith groups based on" prisoner requests, space availability, time considerations of the monthly religious services calendar, the institutions' safety and security requirements, and the availability of a "qualified religious leadership."  (*Id.* at 7.)  Multi-faith gatherings may be held on a regularly scheduled basis for religions that do not have identified volunteer leadership, do not already have scheduled services/ceremonies, and that have "a sufficient number" of prisoners requesting group ceremonies.  (*Id.* at 11.)  DO 904 does not define what is a "sufficient number" or prisoners.

With respect to property, DO 904 provides that senior chaplains make the final decisions as to whether requested religious items are permitted.  (*Id.* at 13.) Religious items used in the practice of a prisoner's declared religious preference may be authorized if they do not pose a safety or security threat, are on the approved items list, and are stored in the prisoner's storage boxes.  (*Id.*)  To order religious items, prisoners must submit a request to Senior Chaplains and including a description of each item, including each item's size, each source's name and contact information, and a complete itemized list of all previously approved religious items currently in the prisoner's possession.  (*Id.* at 14.)

**IV.   Exhaustion**

Defendants argue that Plaintiff failed to exhaust administrative remedies with respect to his requests for religious items "because he has not followed through in the process for requesting the items."  (Doc. 45 at 13.)

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court.  *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926,

934-35 (9th Cir. 2005).  The prisoner must complete the administrative review process in accordance with the applicable rules.  *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it.  *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process).  Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.  The ultimate burden, however, rests with the defendant. *Id.*  Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If the defendants move for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue. *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

Defendants have not produced ADC's grievance procedure and have not presented any facts regarding the grievance procedure.  Defendants therefore have not met their initial burden to show that Plaintiff failed to properly exhaust an available administrative remedy process.  The Court will deny Defendants' Motion for Summary Judgment as to exhaustion.

**V.    Religious Exercise**

As an initial matter, the Court notes that in his Response to Defendants' Motion,

Plaintiff withdraws his First Amendment and RLUIPA claims with respect to group worship and study because those claims are duplicative of his equal protection claim. The Court will therefore deny as moot Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment and RLUIPA claims regarding group services.

### A.    RLUIPA

Plaintiff sues each named Defendant in his individual and official capacities, and he seeks money damages and injunctive relief, among other relief. Under RLUIPA, monetary damages are not available against prison officials in their individual capacities. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011) (holding that RLUIPA's authorization of "appropriate relief" did not "clearly and unambiguously waive sovereign immunity to private suits for damages"). A RLUIPA plaintiff may only sue defendants in their official capacities for prospective injunctive relief. *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) ("[RLUIPA] does not authorize suits against a person in anything other than an official or governmental capacity"). Thus, to the extent that Plaintiff seeks money damages with respect to his RLUIPA claims, such damages are not available.

### 1.    Legal Standard

RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc–5(7)(A), but a prisoner's request for an accommodation must be based on a sincere religious belief and not some other motivation. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014). RLUIPA prohibits the government from imposing a substantial burden on the religious exercise of an institutionalized person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). Therefore, to prevail on a RLUIPA claim, Plaintiff must show that government action has substantially burdened the exercise of his sincere religious beliefs without a compelling government interest or by methods that are more restrictive than necessary. *See Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002). . . . .

### 2. Full-Length Beard

#### a. Additional Facts

Odinism teaches that Odinists are offspring of their Gods, that they were created in their image, and that they should live like them in every way possible in order to receive their blessings and rewards in life, and in the afterlife. (Doc. 50 at 3.) Plaintiff therefore believes that he must wear a full-length beard to show his dedication to Odinn because he was created in Odinn's image specifically. (PCSOF ¶ 21b.) Odinism also teaches that it is considered an honor to the Aesir (the primary tribe of the Gods) to wear a full-length beard and that it is considered unmanly and dishonorable not to. Plaintiff therefore believes that by not wearing a full-length beard, he is not able to receive blessings and rewards from his Gods and he is defiling himself. (*Id.* ¶ 21c.)

On August 2, 2021, Plaintiff requested a religious waiver to grow a full-length beard with no length restriction. (Doc. 46-7 at 4.) Plaintiff stated that he practices the Odinist/Asatru faith and that he sincerely believes that wearing a full-length beard is an important and necessary tenet of his faith. (*Id.*) Plaintiff explained that one of the basic precepts of the Odinist/Asatru faith is that Plaintiff is "an offspring of the Norse Gods and that [he] was created in their image." (*Id.*) Plaintiff wrote that as an Odinist "dedicated to the Chieftan of [his] Gods," he seeks to "receive Odin's blessings by emulating him and his pattern of self-transformation." (*Id.*) Plaintiff stated that "as a practicing God (Priest)" in his faith, it is mandatory that he wear a full-length beard. (*Id.*) On August 10, 2021, Defendant McShane denied Plaintiff's request for a religious waiver, stating that religious waivers were not allowed under DOs 704 and 904. (*Id.* at 5.)

On August 13, 2021, Plaintiff submitted an informal complaint requesting a religious waiver to grow a full-length beard with no length restriction. (*Id.* at 6.) Plaintiff wrote that on August 2, 2021, Officer Jackson required Plaintiff to shave his beard to one inch in length "or suffer disciplinary action," and that in response to this ultimatum, Plaintiff shaved his beard. (*Id.*) Plaintiff reiterated his sincere belief that a full-length beard is an important and necessary tenet of his faith. (*Id.*) On August 23, 2021, Plaintiff

received an informal response denying his request.  (*Id.* at 7.)  The response stated that DOs 704 and 904 did not allow religious waivers for beards of unlimited length.  (*Id.*)

On August 26, 2021, Plaintiff submitted a grievance and requested a religious waiver to grow a full-length beard.  (Doc. 46-7 at 8-9.)  On September 14, 2021, Plaintiff received a grievance response denying his request.  (*Id.* at 10.)  The response stated that "[r]eligious beards had been removed from" DO 904, and all beards, regardless of a prisoner's faith, had to comply with DO 704—i.e., had to be under one inch in length.  (*Id.*)

On September 16, 2021, Plaintiff submitted a grievance appeal and requested a religious waiver to grow a full-length beard with no length restriction.  (*Id.* at 11-12.)  On October 20, 2021, Defendant Shinn, through Appeals Officer M. Stephan and L. Purden, denied Plaintiff's request, stating that DO 704 required Plaintiff to adhere to a one-inch beard length.  (*Id.* at 13.)  Defendant Shinn also denied Plaintiff's request because Plaintiff had "failed to provide any supporting documentation from an authoritative source outlining the tenets of [his] faith that [he] would be practicing by wearing a full beard."  (*Id.*)

On May 29, 2022, Plaintiff submitted an inmate letter to Defendant McShane stating that he had become aware that two Jewish prisoners on Plaintiff's yard have shaving waivers that allow them to grow full-length beards with no length restrictions and that all Muslim prisoners were allowed to grow five-inch beards.  (*Id.* at 14.)  Plaintiff asked why he was "being singled out for unfair treatment as compared to other religions."  (*Id.*)

### b.  Discussion

### (1)  Sincere Religious Beliefs

The initial RLUIPA step "requires a narrow inquiry focused on (1) the specific religious practice at issue and (2) the specific practitioner."  *Johnson v. Baker*, 23 F.4th 1209, 1215 (9th Cir. 2022).  Plaintiff has presented evidence that he sincerely believes that he is required to wear a full-length beard "to show his dedication to Odinn," that wearing a full-length beard "is considered an honor to the Aesir," and that not wearing a full-length beard is "considered unmanly and dishonorable."  Plaintiff has also provided evidence in support of his belief that "by not wearing a full-length beard, he is not able to receive

blessings and rewards from his Gods and he is defiling himself."

In their Motion, Defendants contend that Plaintiff should "fail the Court's sincerity test." (Doc. 45 at 9.)  Defendants assert that "[w]hile Plaintiff can argue that he subjectively holds a sincere belief in his claimed religion as an Odinist, an authoritative text would be necessary to show that such sincere belief is rooted somewhere." (*Id.*)  Defendants argue that because Plaintiff has not "cited any authoritative text to allow him to exceed the one-inch regulation," and because Plaintiff stated in his deposition that "Odinism is open to individual interpretation with no authoritative text," it is therefore "difficult to say that it is rooted in anything." (*Id.*)

The Free Exercise clause mandates a "generous, functional (and even idiosyncratic)" definition of religion.  *United States v. Ward*, 989 F.2d 1015, 1019 (9th Cir. 1992).  The focus is not on whether the beliefs are "true," but whether they are "truly held." *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005).  "Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 714, (1981).

Although First Amendment and RLUIPA religious exercise claims both require a plaintiff to show that his request for accommodation is "sincerely based on religious beliefs and not some other motivation," *Holt v. Hobbs*, 574 U.S. 352, 360 (2015), the Court "may not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Nance v. Miser*, 700 F. App'x 629, 631 (9th Cir. 2017) (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990)).  RLUIPA protects not only practices deemed orthodox by some recognized religious organization, but also idiosyncratic practices—practices 'not compelled by, or central, to a [given] system of religious belief." *Jones v. Slade*, 23 F.4th 1124, 1141 (9th Cir. 2022); *see also Johnson v. Baker*, 23 F.4th 1209, 1215 (9th Cir. 2022) (noting that whether a particular religious practice is compelled by the religion is irrelevant under RLUIPA).  RLUIPA's protection also is "'not limited to beliefs which are shared by all of the members of a religious sect.'"

*Holt*, 574 U.S. at 362 (quoting *Thomas*, 450 U.S. at 715-16).  As the Ninth Circuit stated in *Malik v. Brown*, which involved a First Amendment free-exercise claim, "religious claims that have developed over time are protected to the same extent as those that occur in a moment."  16 F.3d 330, 333 (9th Cir. 1994) (citing *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 144 n.9 (1987) ("So long as one's faith is religiously based at the time it is asserted, it should not matter, for constitutional purposes, whether that faith derived from revelation, study, up-bringing, gradual evolution, or some source that appears entirely incomprehensible.").)

Moreover, to require Plaintiff to produce an "authoritative text" to demonstrate his sincerity would, in effect, require him to show that growing a beard of unlimited length is "central" to his religion—a requirement that is barred under both RLUIPA and the First Amendment.  "RLUIPA 'bars inquiry into whether a particular belief or practice is central to a prisoner's religion.'"  *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (quoting *Cutter*, 544 U.S. at 725 n.13; 42 U.S.C. § 2000cc-5(7)(A)); *see also Shakur v. Schriro*, 514 F.3d 878, 883 (9th Cir. 2008) (concluding it was impermissible for district court to focus on whether consuming Halal meat was a central tenet of Islam).

On summary judgment, the Court must accept as true Plaintiff's evidence that he sincerely believes that growing a beard of unlimited length is consistent with his religion; to do otherwise would require an impermissible credibility determination regarding the sincerity of Plaintiff's religious beliefs.  *See United States v. Seeger,* 380 U.S. 163, 185 (1965) (determining sincerity of religious beliefs of individual "is, of course, a question of fact"); *Jones*, 23 F.4th at 1145 (noting that it was impermissible for the district court to focus on whether reading religious texts was required to observe Ramadan, rather than whether the plaintiff sincerely believed reading these texts during Ramadan was consistent with his faith).  On this record, there is a question of fact whether Plaintiff sincerely believes his religion requires him to grow a full-length beard.

### (2)    Substantial Burden

"Under RLUIPA, the plaintiff bears the initial burden of demonstrating that an

institution's policy constitutes a substantial burden on his exercise of religion." *Id.* at 1140. "[A] 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quotations omitted). Thus, an institutionalized person's religious exercise is substantially burdened "'where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his belief.'" *Id.*

A policy may substantially burden religious exercise by forbidding conduct that a prisoner believes he is religiously compelled to do, *see O'Lone v. Estate of Shabazz*, 482 U.S. 342, 344-45 (1987), or by compelling a prisoner to do that which he believes he is religiously forbidden from doing, *see Holt*, 574 U.S. at 355, 359. A regulation may also impact religious exercise indirectly, "by encouraging an inmate to do that which he is religiously prohibited or discouraged from doing," or by "discouraging an inmate from doing that which he is religiously compelled or encouraged to do." *Jones*, 23 F.4th at 1140.

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he has "complied with the beard length requirement" and "has not been subject to any punishment." (Doc. 45 at 10.) This argument misses the point of the "substantial burden" inquiry. Plaintiff has shown that he is subject to disciplinary action if his beard does not comply with ADC's grooming policy and that he complied with the beard length requirement, *despite* his religious beliefs, to avoid punishment. There is a question of fact whether the grooming policy substantially burdens Plaintiff's religious exercise because it discourages him from growing his beard by mandating punishment for violation of the policy. *See Nance*, 700 F. App'x at 632 (rejecting argument that the threat of disciplinary action for failing to shave is insufficiently coercive as contrary to Supreme Court and Ninth Circuit precedent). A reasonable jury could conclude that the beard-length policy, which prohibits Plaintiff from growing a full-length beard, substantially burdens Plaintiff's religious exercise. *See Greene*, 513 F.3d at 988 (noting that the Ninth Circuit has had "little difficulty in concluding that an outright ban on a particular religious exercise

1    is a substantial burden on that religious exercise").

2                        **(3)     Compelling Government Interest**

3           Under RLUIPA, the government cannot discharge its burden to show a compelling

4    government interest "by pointing to 'broadly formulated interests.'"  *Ramirez v. Collier*,

5    595 U.S. 411, 427 (2022) (quoting *Burwell*, 573 U.S. at 726).  Rather, the government must

6    "'demonstrate that the compelling interest test is satisfied through application of the

7    challenged law [to] the particular claimant whose sincere exercise of religion is being

8    substantially burdened.'"  *Id.* (quoting *Holt*, 574 U.S. at 363).  The government therefore

9    cannot satisfy its burden with only conjecture or speculation about what might occur in

10   some future case.  *See id.* at 430.  In *Holt*, the Supreme Court recognized that prison

11   officials have a compelling interest in staunching the flow of contraband into and within

12   its facilities.  574 U.S. at 363.

13          Defendants argue that Plaintiff's request to grow a beard with no length restrictions

14   "is different from some recent cases."  (Doc. 45 at 10.)  Defendants cite *Smith v. Owens*,

15   13 F.4th 1319 (11th Cir. 2021), in which the plaintiff asserted that the prison's grooming

16   policy, which prohibited prisoners from growing facial over a half-inch in length, placed a

17   substantial burden on his religious exercise.  *Id.* at 1321.  Citing evidence presented at trial

18   that "untrimmed beards raise concerns about hiding contraband and altering their

19   appearance to avoid identification, as well as injury each other by grabbing beards during

20   altercations," the Eleventh Circuit concluded that the district court did not commit clear

21   error in finding that allowing any prisoner, including the plaintiff, to grow an untrimmed

22   beard presented safety and security risks.  *Id.* at 1329.

23          Even if *Smith* were binding on this Court, Defendants have not produced *any*

24   evidence to support that a beard of unlimited length is any more susceptible to hiding

25   contraband than other forms of attire permitted under ADC policies.  Although they point

26   to DO 704, which requires "[a]ll inmates coming through any intake process at designated

27   Department Reception Centers . . . to shave any facial hair to facilitate a clean picture for

28   the Mug Photo Interface Subsystem" (Doc. 46-2 at 5), this provision only applies to a

prisoner's initial mug photo and permits the growth of facial hair after a prisoner's initial intake.  And prisoners are permitted to wear hair long enough to "touch the top of the shoulder," and to wear state-issued ball caps, head coverings, do-rags, and "winter head gear." (*Id*. at 4.)  There is no evidence to support that a beard of unlimited length presents a greater security concern than hair "long enough to touch the top of the shoulders," ball caps, do-rags, or winter head gear, all of which are permitted under ADC policies.

With respect to appearance, in *Holt*, the Supreme Court agreed that prisons have a compelling interest in the quick and reliable identification of prisoners and that "any alteration in a prisoner's appearance, such as by shaving a beard, might, in the absence of effective countermeasures, have at least some effect on the ability of guards or other to make a quick identification."  574 U.S. at 365-66.  Nevertheless, the Supreme Court concluded that the grooming policy at issue violated RLUIPA under the circumstances presented, reasoning that even if a prisoner had a beard when he was photographed for identification and could confuse guards by later shaving his beard, prison officials "could largely solve this problem by requiring that all inmates be photographed without beards when first admitted to the facility and, if necessary, periodically thereafter." *Id.* at 366.

With respect to the possibility of prisoners injuring one another by pulling on their beards, Defendants have produced no evidence that allowing a prisoner to grow a beard of unlimited length for religious reasons is likely to result in incidents of prisoners injuring each other by grabbing their beards during altercations.

Based on this record, Defendants have not shown that prohibiting Plaintiff from growing a beard of unlimited length in accordance with his religious beliefs furthers a compelling government interest.

### (4)   Least Restrictive Means

"The least-restrictive-means standard is exceptionally demanding," and it requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Burwell,* 573 U.S. at 728.  The Ninth Circuit has emphasized that a prison "cannot meet its

burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice."   *Shakur*, 514 F.3d at 890; *see also Warsoldier*, 418 F.3d at 1000 ("[P]rison officials must set forth detailed evidence, tailored to the situation before the court, that identifies the failings in the alternatives advanced by the prisoner.").  This Court "must not 'assume a plausible, less restrictive alternative would be ineffective.'"  *Holt*, 574 U.S. at 369 (quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 824 (2000)).

Defendants have not addressed the least restrictive means prong of the RLUIPA analysis or presented any evidence that they considered and rejected the efficacy of less restrictive measures.  The Court finds Defendants have not met their burden to show that they considered and rejected less restrictive measures with respect to Plaintiff's request to grow a full-length beard.

**(5)   Deference**

Finally, Defendants argue that the Court should "give deference to the Defendants here as prison administrators are given in other instances."  (Doc. 45 at 10.)  The Supreme Court in *Holt* recognized that although courts should defer to prison officials' expertise in running prisons and evaluating the likely effects of altering prison rules, "that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard."  574 U.S. at 364.  In other words, RLUIPA does not permit "unquestioning deference."  *Id.*  Defendants would have this Court apply "a degree of deference that is tantamount to unquestioning acceptance," even in the absence of evidence that the prohibition on beards longer than one inch "actually furthers" any compelling government interest.  *Id.*  The Court rejects this suggestion.

In short, there are genuine disputes of material fact that preclude judgment as a matter of law in favor of Defendants with respect to Plaintiff's request to grow a full-length beard in accordance with his religious beliefs.

. . . .

### 3.   Religious Items

#### a.   Additional Facts

Plaintiff believes that he is required to practice his faith through their "daily actions ('true work')," rituals, prayers, devotionals, greetings, rites, runework, and different meditations. (Doc. 51 at 50.) Plaintiff believes that "true work" helps an Odinist receive blessings and rewards from his Gods and ancestors and deepens his relationships with them. (*Id.*) Plaintiff believes there are "essential religious items ('tools') that are needed for individual study and practice," including a religious calendar, laminated cards depicting the Norse Gods and Goddesses, runes and a rune bag, a runecasting cloth, rune cards, hleth (headwear), an altar cloth, a religious medallion or amulet, a personal oath ring, a meadhorn cup, a bowl, a gandr, feathers, an electric candle, a crystal, a bell, prayer oils, a rattle, evergreen sprigs, salt, skywater (rain), earth (dirt), prayer/meditation beads, a meditation mat, a meditation pillow, meditation compact discs, spiritual books, crushed herbs/smudge sticks, an abalone shell, an herb grinder, and a paper sword. (*Id.*; Doc. 51-1 at 1-6.) Plaintiff believes these items are essential to the individual study and practice of Odinism because they "track the recognized religious [illegible] that call for mandatory observance"; provide knowledge, healing, and daily protection; sanctify and hallow areas used for individual practice; and purify and consecrate the ritual tools used for individual practice. (*Id.* at 6-7.)

On June 7, 2021, Plaintiff submitted an inmate letter requesting approval to purchase eight ounces of herbs to be used for cleansing and purification purposes during the practice of his faith, several religious books, a religious pendant and chain, two sets of cards depicting the Norse Gods and Goddesses, and an altar cloth to be used for his personal studies and daily practice. (Doc. 46-7 at 39.) Defendant McShane signed off on both inmate letters and forwarded them to Defendant Henry. (*Id.*) On July 19, 2021, Defendant Henry denied Plaintiff's request for the herbs, stating that the herbs were not an approved item for Plaintiff's listed religious preference. (Doc. 46-8 at 3.) Defendant Henry also denied Plaintiff's request for the books because they were not approved through the

chaplaincy.  (*Id.* at 4.)  Defendant Henry denied the request for cards stating that the cards were not on the approved items list.  (*Id.*)

On September 8, 2021, Plaintiff submitted an inmate letter requesting a copy of the approved items list for the Odinism/Asatru religion.  (*Id.* at 5.)  On September 13, 2021, Defendant McShane responded to Plaintiff's inmate letter stating that the approved items list reflected the items that had been requested by prisoners and approved by the Religious Accommodation Review Committee (RARC).  (*Id.* at 6.)  Defendant McShane advised Plaintiff that prisoners could only request and/or possess religious items that were "consistent with" their documented religious preference and that after consultation with Defendant Henry, any requests for additions to the approved items list needed to be forwarded to the Central Office for review by the RARC.  (*Id.*)

On September 28, 2021, Plaintiff submitted an inmate letter to the RARC explaining that he was trying to purchase religious items needed to assist him in the daily practice of his faith.  (*Id.* at 7.)  Plaintiff attached several documents to his inmate letter and outlined the 31 religious items that he sought to add to the approved items list for Odinism.  (*Id.* at 7-15.)  Plaintiff explained why each religious item was necessary and for what purpose and "made it clear" that the religious items were necessary for him to individually exercise and practice his spiritual beliefs, as well as to conduct daily ritual ceremonies used in the worship and honoring of his Gods and Goddesses.  (*Id.*)

On October 25, 2021, Plaintiff sent an inmate letter to Defendant McShane asking whether the Central Office had received his request to the RARC.  (*Id.* at 16.)  On October 27, 2021, Defendant McShane responded to Plaintiff's inmate letter stating that the RARC no longer existed and that his request would be forwarded to Defendant Henry.  (*Id.*)

On November 1, 2021, Plaintiff sent an inmate letter to Defendant Henry outlining the 31 religious items that Plaintiff sought to add to the approved items list for Odinism and explained the purpose of each item.  (*Id.* at 18-27.)  On November 2, 2021, Plaintiff received an inmate letter response from Defendant Herman.  (*Id.* at 28-31.)  Defendant Herman outlined the procedure for prisoners to purchase religious items and advised

Plaintiff to resubmit his request to purchase each religious item "as if the item had been approved," one at a time.  (*Id.* at 28-29.)  Defendant Herman informed Plaintiff that he must provide "holy text documentation demonstrating the requested item is mandatory" for the observance of his religion.  (*Id.* at 29.)  Defendant Herman denied Plaintiff's requests for most of the 31 religious items that Plaintiff had requested, stating they were "not approved at this time for your declared religious preference."  (*Id.* at 29-30.)  Defendant Herman approved the requests for a religious calendar, altar cloth, medallion, mead horn cup, gandr, and paper sword.  (*Id.* at 29-31.)  Defendant Herman noted that prayer oils could be purchased from the inmate store and that meditation CDs and spiritual books were publication items, not religious items, and must meet the requirements of DOs 904 and 914.  (*Id.* at 30.)

On December 8, 2021, Plaintiff sent an inmate letter to Defendant McShane asking him to define what the ADC Chaplaincy considered to be "holy text documentation." (PCSOF ¶ 19a.)  Defendant McShane sent a response defining "holy text" as books, like the Holy Bible, Koran, and Torah, or "sacred writing" that is "recognized by the entire belief system."  (*Id.*)

On December 13, 2021, Plaintiff submitted an informal complaint requesting approval of all 31 of his requested religious items.  (*Id.* at 33.)  Plaintiff noted that he had sent an inmate letter to Defendant McShane and McShane's response.  (*Id.*)  Plaintiff explained that there is no "holy text documentation" explaining the importance of the religious items he had requested and offered to provide the Chaplaincy with books, articles, and other documentation written by the leading authority in his religion to explain the importance of the requested religious items, why they were necessary, and what they were used for.  (*Id.*)  Plaintiff noted that he had previously provided the documentation and was told that the books and articles were not "holy text documentation."  (*Id.*)  It appears Plaintiff did not receive a response to the informal complaint.

On January 17, 2022, Plaintiff submitted a grievance requesting approval of the 31 requested religious items.  (*Id.* at 35-36.)  Plaintiff described the problems he was having

trying to resolve the matter and pointed out that the Chaplaincy had "refused to follow" ADC policy and that he had been threatened with disciplinary action, had been referred to a committee that no longer existed, and was now required to follow a standard of proof contrary to RLUIPA.  (*Id.*)  On February 8, 2022, Plaintiff received a grievance response stating that some of the requested items were approved and that Plaintiff should follow the procedures for requesting non-approved items, including submitting "only one item at a time."  (*Id.* at 37.)

On February 11, 2022, Plaintiff submitted a grievance appeal, which Defendant Shinn denied on April 1, 2022, on the basis that Plaintiff had "provided no evidence that [he] complied with" Defendant Herman's "clear instructions on how to appropriately go about requesting [] religious items."  (*Id.* at 38-40.)

On August 29, 2022, Plaintiff sent an Inmate Letter requesting a copy of the property request procedure for non-authorized religious items.  (*Id.* at 12.)  On August 31, 2022, Defendant McShane sent Plaintiff an Inmate Letter Response that set forth the procedure for requesting approval for religious items.  (Doc. 51 at 23.)  The Response states that Plaintiff should "[i]nclude specific information about the usage of [each] item in [his] religion" and that "[p]roviding corroborating printed information will assist in expediting your request."  (*Id.*)

### b.    Discussion

Defendants argue that Plaintiff cannot demonstrate a substantial burden on his religious exercise because he "cannot provide authoritative text from his religion documenting the need for each of the 31 items he is requesting."  (Doc. 45 at 12.) Defendants contend that Plaintiff has not shown that the items he requested are "required by his religion."  (*Id.* at 13.)

In his Response, Plaintiff asserts that the requirement that he produce "holy text documentation" to support his request for religious items and Defendants' denial of his requests for religious items substantially burdens his religious exercise.  (Doc. 50 at 11.) Plaintiff also has produced nearly 200 pages of texts that describe and define the practices

associated with Odinism, the significance of the practices, and the items required for the practices.  (Docs. 51-1 through 51-4, Doc. 51-5 at 1-10.)  Plaintiff contends that it was impossible for him to meet "Defendants['] demands that Plaintiff show that his requested religious items were 'mandatory'' to observe his religion and to submit 'holy text documentation' to that effect."  (Doc. 50 at 12.)

Defendants' argument fails for two reasons.  First, the Supreme Court has made it clear that courts must not make distinctions between religious interpretations or attempt to determine whether an individual correctly perceives the commands of his faith.  *Thomas*, 450 U.S. at 716.  As the Supreme Court in *Thomas* recognized, "intrafaith differences" about what is acceptable in a particular religion "are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses."  *Id.*; *see also Nance*, 700 F. App'x at 632 (concluding that the district court erroneously concluded that the plaintiff's claimed religious exercises were not substantially burdened because the plaintiff had not sufficiently demonstrated that the exercises were significant to his overall religious practice as a Muslim).

Second, whether Plaintiff can comply with the requirements of the religious items policy is relevant to whether the policy itself substantially burdens the exercise of his religion.  Plaintiff has presented evidence that there is no equivalent form of "holy text" in Odinism and that Odinists rely on "lore" and "unverified personal gnosis."  (Doc. 51-1 at 29.)   For example, Plaintiff has produced an excerpt from "Exploring the Northern Tradition, A Guide to the Gods, Lore, Rites, and Celebrations from the Norse, German, and Anglo-Saxon Traditions," which states that "[f]or the modern Heathen, much of the practical application of our sacred tradition is drawn from clues found in the Icelandic Sagas; the Poetic and Prose Eddas; Anglo-Saxon historical, legal, and medical texts; as well as modern archaeological, linguistic, and anthropological research."  (*Id.* at 29-34.) "Studying these texts is very nearly a devotional experience for most Heathens, and this body of work is generally referred to as 'the Lore.'"  (*Id.*)  A reasonable jury could conclude

that the policy, which requires Plaintiff to produce documentation that does not exist in his religion to obtain items he sincerely believes are necessary to the practice of his religion, substantially burdens Plaintiff's religious exercise.

Defendants do not address the compelling interest and least restrictive means prongs of the RLUIPA analysis.  Based on this record, there are genuine disputes of material fact that preclude judgment as a matter of law in favor of Defendants as to Plaintiff's requests for religious items.

### B.    First Amendment

#### 1.    Legal Standards

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion."  *O'Lone*, 482 U.S. at 348 (internal quotations and citations omitted). "The right to free exercise is to be 'jealously guarded,'" but "free exercise is necessarily limited by the fact of incarceration and 'may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.'"  *Jones*, 23 F.4th at 1143 (internal citation omitted).  "To merit protection under the free exercise clause of the First Amendment, a religious claim must satisfy two criteria. 'First, the claimant's proffered belief must be sincerely held.'"  *Malik*, 16 F.3d at 333. "Second, 'the claim must be rooted in religious belief, not in purely secular philosophical concerns.'" *Id.* (quoting *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)). "Determining whether a claim is 'rooted in religious belief' requires analyzing whether the plaintiff's claim is related to his sincerely held religious belief."  *Id.* (quoting *Callahan*, 658 F.2d at 683-84).

#### 2.    Sincerely Held Belief Rooted in Religious Belief

The Supreme Court has emphasized that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."  *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). Likewise, in *Employment Division*, the Supreme Court reiterated that "[i]t is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a

'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field." 494 U.S. at 887; *see also Callahan*, 658 F.2d at 685 ("In applying the free exercise clause of the First Amendment, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs.").

Defendants contend that Plaintiff "must show that growing out his beard is a practice consistent with his faith." (Doc. 45 at 9.) Defendants assert that although Plaintiff can "argue that he subjectively holds a sincere belief in his claimed religion as an Odinist, an authoritative text would be necessary to show that such sincere belief is rooted somewhere." (*Id.*) Defendants argue that Plaintiff has not cited any authoritative text to allow him to exceed the one-inch regulation and admitted that other practitioners may not believe that a full-length beard is required to practice his faith. (*Id.*)

In his Response, Plaintiff reiterates that there is no singular "holy text" in Odinism. (Doc. 50 at 9.) Rather, Plaintiff notes that he provided authoritative text explaining the importance of wearing a full-length beard in Odinism and outlined the teachings in Odinism. (*Id.*) He points out that in the Complaint, he avers that he believes wearing a full-length beard is an important and necessary tenet of his faith, and in his inmate letters and grievances, he repeatedly stated that he sincerely believes that wearing a full-length beard is an important and necessary tenet of his faith. (*Id.*) Plaintiff also noted that "no one had denied his request for lack of sincerity, or because they disagreed that wearing a full-length beard is an important and necessary tenet of his faith." (*Id.*)

For the reasons discussed above, Plaintiff has shown that his belief in the necessity of a full-length beard to his practice of Odinism is a sincerely held religious belief.

### 3.    Full-Length Beard

#### a.    Substantial Burden

For the reasons discussed above, Plaintiff has shown that the prohibition on full-length beards substantially burdens his religious practice.

. . . .

1

**b.      Valid, Rational Connection**

2      Once a prisoner demonstrates that the challenged regulation impinges on his

3  sincerely held religious exercise, the burden shifts to the government to show that the

4  regulation is "reasonably related to legitimate penological interests."  *Jones*, 23 F.4th at

5  1144 (quoting *Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015)).   To determine

6  whether a prison regulation is reasonably related to a legitimate penological interest, four

7  factors must be balanced: (1) whether there is a valid, rational connection between the

8  regulation and the legitimate governmental interest; (2) whether there are alternative means

9  of exercising the right that remain open to prisoners; (3) the impact accommodation of the

10  right will have on guards and other prisoners, and on the allocation of prison resources;

11  and (4) the absence of ready alternatives.  *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).

12  *Turner* addressed the reasonableness of prison regulations but also applies to individual

13  acts by prison officials.  *See O'Lone*, 482 U.S. at 348.

14      The first *Turner* factor is the most important.  *Jones*, 23 F.4th at 1135.   To evaluate

15  whether a valid, rational connection exists, the Court must determine "'whether the

16  governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether

17  the policy is rationally related to that objective.'"  *Id.* (quoting *Mauro v. Arpaio*, 188 F.3d

18  1054, 1058 (9th Cir. 1999) (en banc)).  The challenged policy "cannot be sustained where

19  the logical connection between the regulation and the asserted goal is so remote as to render

20  the policy arbitrary or irrational."  *Turner*, 482 U.S. at 89.

21      The Court "must apply a deferential standard of review to challenges regarding

22  prison regulations."  *Mauro*, 188 F.3d at 1058.  "Prison officials need merely put forward

23  a legitimate government interest and provide some evidence that the interest put forward

24  is the actual reason for the regulation."  *Casey v. Lewis*, 4 F.3d 1516, 1520-21 (9th Cir.

25  1993) (internal quotation marks and citations omitted).

26      Here, Defendants have not shown that the policy permitting one-inch beards and

27  prohibiting longer beards is a legitimate and neutral means of achieving a governmental

28  objective.  As discussed above, Defendants have not produced evidence that demonstrates

that allowing prisoners to grow full-length beards—as opposed to beards of one inch or less—produces additional security and safety concerns.  And Plaintiff has produced sworn declarations from two Jewish prisoners who are housed in Plaintiff's yard averring that they are permitted to wear full-length beards with no length restrictions in accordance with their religious beliefs.  (Decl. of Jerome P. Shaw, Doc. 51-5 at 23-24; Decl. of Michael Sprouse, Doc. 51-5 at 26.)  In addition, in his discovery responses, Defendant Shinn stated that one Muslim prisoner on Plaintiff's yard is permitted to wear a beard longer than one inch in accordance with his religious beliefs.  (Doc. 51 at 17.)  The first *Turner* factor weighs in favor of Plaintiff.

### c.  Alternative Means of Exercising the Right

The Ninth Circuit in *Ward v. Walsh*, 1 F.3d 873 (9th Cir. 1993), stated that the relevant inquiry under the second *Turner* factor is "not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected," but rather, "whether the inmates have been denied all means of religious expression.  *Id.* at 877.  Thus, curtailing "various ways of expressing belief, for which alternative ways of expressing belief may be found," does not implicate the First Amendment.  *Id.*

Here, Plaintiff has produced evidence that he believes his faith *requires* him to grow a full-length beard to show his dedication to Odinn and because it is an honor to the Aesir to wear a full-length beard, it is considered unmanly and dishonorable not to, and by not wearing a full-length beard, he is defiling himself and cannot receive blessings and rewards from his Gods.  Plaintiff has no alternative means of engaging in the practice of growing a full-length beard because there is no other similar practice in his religion that allows him to express his beliefs.  *See Nance*, 700 F. App'x at 632 (noting that although the plaintiff could purchase unscented oils and that he did not respond to an offer to use scented oils in group ceremonies, these accommodations did not permit the religious exercise the plaintiff identified).  The second *Turner* factor weighs in favor of Plaintiff.

. . . .

1

#### d.      Impact of Accommodation

2      Defendants have not produced any evidence regarding the impact of

3  accommodating Plaintiff's request to grow a full-length beard or addressed the third *Turner*

4  factor.  They have therefore failed to carry their burden on this factor, and it weighs in

5  favor of Plaintiff.

6

#### e.      Absence of Ready Alternative

7      Defendants have not presented evidence that there is no ready alternative to a

8  prohibition on beards of greater than one inch and have not addressed the fourth *Turner*

9  factor.

10      On balance, there are genuine disputes of material fact that preclude summary

11  judgment in favor of Defendants as to Plaintiff's First Amendment claim regarding

12  growing a full-length beard.

13

### 4.      Religious Items

14      Defendants argue that Plaintiff "has produced no evidence to support his claim here

15  as he cannot provide authoritative text from his religion documenting the need for each of

16  the 31 items he is requesting," but they otherwise do not address the First Amendment

17  analysis with respect to Plaintiff's requests for religious items.  (Doc. 45 at 12.)  For the

18  reasons discussed above, there are genuine disputes of material fact that preclude summary

19  judgment in favor of Defendants as to Plaintiff's First Amendment claim regarding the 31

20  religious items.

21

### C.      Qualified Immunity

22      Government officials enjoy qualified immunity from civil damages unless their

23  conduct violates "clearly established statutory or constitutional rights of which a reasonable

24  person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In deciding

25  if qualified immunity applies, the Court must determine: (1) whether the facts alleged show

26  the defendant's conduct violated a constitutional right; and (2) whether that right was

27  clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-

28

32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, a defendant should prevail if the right asserted by the plaintiff was not "clearly established" or the defendant could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

In their Motion, Defendants argue, without support, that they did not act in violation of clearly established Supreme Court and Ninth Circuit precedent. (Doc. 45 at 17.) Citing *Halloum v. Ryan*, CV-11-0097-PHX-RCB, 2014 WL 1047144, at *17 (D. Ariz. Mar. 18, 2014),[1] Plaintiff contends the right to grow a beard in accordance with his religious beliefs under the First Amendment was clearly established in 2014. (Doc. 50 at 16.) He asserts that the Supreme Court "rejected the objective test for free exercise claims decades ago," and that the same principles apply to his requests for religious items. (*Id.*) Plaintiff further asserts that his rights under RLUIPA are clearly established. In their Reply, Defendants argue that Plaintiff "provides a general conclusory assertion that his rights have been

---

[1] In *Halloum*, the plaintiff, a Muslim, requested a shaving waiver. 2014 WL 1047144, at *9. The Court determined the defendants were not entitled to qualified immunity, observing that "[t]he Supreme Court long ago established that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* at *17 (quoting *Thomas*, 450 U.S. at 713-14.) The Court also noted that it was clearly established that "the First Amendment protects a prisoner's sincere religious beliefs, not just central tenets of his faith, and that prison officials may not substantially burden inmates' right to the free exercise of their religion without some legitimate penological justification." *Id.* (quoting *Shakur*, 514 F.3d at 883-85.)

violated and therefore qualified immunity is not proper," but he "fails to provide any evidence that Defendants' conduct violated clearly established Supreme Court or Ninth Circuit precedent."  (Doc. 59 at 16.)

As discussed above, there are genuine disputes of material fact as to whether Defendants violated Plaintiff's rights under the First Amendment and RLUIPA.  In 2021, it was clearly established that a prison regulation that substantially burdens a prisoner's sincerely held religious beliefs and is not "reasonably related to legitimate penological interests" violates the First Amendment.  *See O'Lone*, 482 U.S. at 348; *Emp't Div.*, 494 U.S. at 887; *Hernandez*, 490 U.S. 680; *Turner*, 482 U.S. at 89-90.  It was also clearly established that a prison regulation violates RLUIPA if it substantially burdens a prisoner's sincerely held religious beliefs and does not further a compelling governmental interest by using the least restrictive means.  *See Holt*, 574 U.S. at 60; *Burwell*, 573 U.S. at 717; *Cutter*, 544 U.S. at 725; *Emp't Div.*, 494 U.S. at 887; *O'Lone*, 482 U.S. at 344-45; *Thomas*, 450 U.S. at 714.  Defendants do not—and cannot—argue that these precedents were not clearly established or somehow do not apply to this case.

The Court concludes Defendants are not entitled to qualified immunity with respect to Plaintiff's First Amendment and RLUIPA claims.

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment as to Plaintiff's RLUIPA and First Amendment claims regarding beard length and religious items.

## VI.     Equal Protection

### A.     Legal Standards

Plaintiff may establish an equal protection claim in two ways.  First, Plaintiff may assert Defendants intentionally discriminated against him based on his membership in a protected class.  *See, e.g.*, *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).  "The Equal Protection Clause prohibits the government from classifying people based on suspect classes, unless the classification is narrowly tailored to satisfy a compelling governmental interest (i.e., the

government's action passes strict scrutiny)." *Al Saud v. Days*, 50 F.4th 705, 709-710 (9th Cir. 2022).

Second, Plaintiff may establish an equal protection claim by showing that similarly situated individuals were intentionally treated differently, and that Defendants' actions against him lacked a rational basis or legitimate purpose.  To prevail on a class-of-one equal protection claim, Plaintiff must show: (1) he is a member of an identifiable class; (2) he was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment.  *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Thornton*, 425 F.3d at 1167.

### B.   Additional Facts

#### 1.   Religious Items

Plaintiff submitted what appears to be a portion of a list of approved religious items. (Do. 51 at 30.)  The list does not have a date or any other context, but it states that practitioners of Odinism/Wotanism may possess an altar cloth, bowl, candle, Gandr (runestaff), mead horn cup, and a paper sword.  (*Id.*)  Plaintiff also submitted an Approved Religious Items List, dated November 1, 2019, which states that practitioners of all religions may possess a religious calendar and a medallion.  Practitioners of Asatru may possess an alter cloth, bowl, chalice, Gandr (runestaff), herbs, hiath, mead horn cup, prayer beads, runes, smudging shell, paper sword, and Thor's Hammer.  (*Id.* at 35.)  Practitioners of Aztec may possess a feather, herbs, Oracle Cards incorporating numerology, symbolism, and mythology for ceremony, and a prayer stone.  (*Id.*)  Buddhist prisoners may possess a gong and striker, a meditation mat, a meditation pillow, and a twig.  (*Id.*)  Druid prisoners may possess an electric candle, a feather, ritual stones, runes, a rune bag, and rune sticks, and tarot cards.  (*Id.* at 35-36.)  Hindu practitioners may possess a bell, and practitioners of Islam may possess head coverings to be worn during religious ceremonies.  (*Id.* at 36.) Native American prisoners may possess smudging herbs.  (*Id.* at 37.)  Practitioners of Santeria may possess up to five elekes (necklaces).  (*Id.* at 38.)  And practitioners of Wicca/Pagan may possess a crystal, a rattle, salt, and a seashell for smudging.  (*Id.* at 39.)

1

### 2. Group Services

2        On November 1, 2021, Plaintiff submitted an inmate letter requesting authorization

3    for the Odinist/Asatru faith community to gather weekly for group worship and group

4    study. (Doc. 46-7 at 29.) Plaintiff pointed out that the Odinist/Asatru faith community

5    was only allowed to gather every other week, although non-pagan faith-based groups, such

6    as Christians and Latter-Day Saints, were allowed to gather weekly and sometimes two or

7    three times per week. (*Id.*) Plaintiff requested that the Odinist/Asatru faith community be

8    given the same opportunities that other faith-based groups were given. (*Id.*)

9        On November 8, 2021, Defendant McShane responded to Plaintiff's inmate letter

10    stating that the Chaplaincy would try to consult with the Deputy Warden regarding the

11    group worship schedule. (*Id.* at 30.) On November 22, 2021, Defendant McShane denied

12    Plaintiff's request stating that multi-faith gatherings would "continue on the scheduled

13    rotation." (*Id.* at 31.)

14        On December 2, 2021, Plaintiff submitted an informal complaint requesting that he

15    be allowed to gather once per week for group worship and group study with other prisoners

16    who practiced his faith. (*Id.* at 32.) On December 3, 2021, Defendant Henry denied

17    Plaintiff's request stating that the current rotation for the Odinist/Asatru faith community

18    would remain the same because 1) the rotation reduced the number of prisoners attending

19    at the same time and allowed the chaplaincy to operate within the maximum capacity

20    considerations set by security; and 2) the rotation was based on chaplaincy availability to

21    supervise the multi-faith services. (*Id.* at 33.)

22        On December 14, 2021, Plaintiff submitted an inmate grievance again requesting

23    that he be allowed to gather once per week for group worship and group study with other

24    prisoners who practiced his faith. (*Id.* at 34.) Plaintiff pointed out that the number of

25    prisoners allowed to attend group gatherings for religious activities only applied to the

26    pagan faith-based groups because all other non-pagan faith-based groups were allowed to

27    gather in numbers significantly higher than the total number of the pagan faith-based

28    groups. (*Id.* at 35.) Plaintiff also noted that chaplaincy availability "had never been an

1  issue," and when it did become an issue, yard staff assisted with supervising the non-pagan
2  faith-based groups.  (*Id.* at 35.)

3        On January 11, 2022, Plaintiff's grievance was denied.  (*Id.* at 36.)  The response
4  stated that if the Odinist/Asatru faith community could find volunteer leadership willing to
5  come to the yard on a weekly basis, then the request to gather weekly would be considered.
6  (*Id.*)

7        On January 14, 2022, Plaintiff submitted a grievance appeal, which Defendant
8  Shinn, through Appeals Officer M. Stephan and L. Purden, denied on February 22, 2022.
9  (*Id.* at 37-38.)  The response stated that due to a lack of volunteer leadership, chaplaincy
10  availability, and the needs of the unit, the current multi-faith gathering schedule was
11  appropriate.  (*Id.* at 38.)  The response stated that if Plaintiff had a volunteer, then a separate
12  service could be established.  (*Id.*)

13      **C.**  **Discussion**

14          **1.**  **Protected Class**

15        In this case, the relevant class for comparative purposes is prisoners who sought
16  accommodations based on their sincere religious beliefs.  *See Furnace v. Sullivan*, 705 F.3d
17  1021, 1030 (9th Cir. 2013).  Religion is a suspect class.  *Al Saud*, 50 F.4th at 710.
18  Accordingly, Defendants' different treatment of Odinism, based on Odinism's lack of a
19  "holy text," must pass strict scrutiny; that is, Defendants must demonstrate that their course
20  was "justified by a compelling state interest and was narrowly tailored in pursuit of that
21  interest."  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (citing *Church of*
22  *Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

23        As discussed above with respect to Plaintiff's religious exercise claims, Defendants
24  have not produced any evidence that denying Plaintiff's requests for accommodations was
25  justified by a compelling state interest and was narrowly tailored in pursuit of that interest.
26  Plaintiff has produced evidence that Odinists and other religious groups have sought the
27  same religious accommodations, but Plaintiff's requests have been denied because he
28  cannot produce a holy text or "authoritative text" that establishes his religious beliefs.  As

a result, Plaintiff has not been permitted to grow a full-length beard, as ADC has permitted Jewish and Muslim prisoners to do; has not been permitted to possess religious items that ADC has permitted prisoners of other religions to possess; and he has not been permitted to gather weekly with fellow Odinists, with assistance from prison officials to ensure weekly gatherings occur, as have Muslim prisoners.  Although it is true that prison officials are not obligated to provide identical facilities or services to different faiths, *see Hartmann v. Cal. Dep't of Corr. Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013), Defendants have not met their burden to show that treating Plaintiff's religion differently from other religions furthered a compelling state interest.

Based on this record, there are genuine disputes of material fact regarding whether Defendants' requirement that Plaintiff produce a holy text to substantiate his requests for religious accommodations violated the Equal Protection Clause.

### 2.    Class of One

In a class of one claim, the plaintiff still bears the burden of proving that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Thornton*, 425 F.3d at 1167 (quoting *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002)).

### a.    Full-Length Beard

As noted, Plaintiff has shown that at least two Jewish prisoners have shaving waivers that permit them to grow full-length beards in accordance with their religious beliefs, and at least one Muslim prisoner has been permitted to grow a beard longer than once inch in accordance with his religion.  Defendants characterize the relevant class as prisoners who can demonstrate through an "authoritative text" that their religion requires them to grow longer beards and contend that Plaintiff is not "similarly situated" because he cannot produce such an "authoritative text" for Odinism.  (Doc. 45 at 14.)  Defendants assert that allowing a waiver of the beard policy "without such proof would mean that Plaintiff would be treated in a more favorable manner than the inmate who did provide proof that could be cited to for his belief."  (*Id.*)

Defendants' characterization of the relevant class is too narrow, and their framing contravenes the authorities discussed above limiting the scope of a court's inquiry into the centrality of a religious belief. The relevant class for purposes of Plaintiff's equal protection claim is prisoners who wish to grow beards longer than one inch in accordance with their religious beliefs. Framed correctly, Plaintiff is similarly situated to the Jewish and Muslim prisoners.

Defendants have produced no evidence that there is a rational basis for treating Plaintiff differently from the Jewish and Muslim prisoners. Differentiating between prisoners who practice religions that have singular holy texts and a prisoner who practices a religion that does not have a singular holy text is not a rational basis for treating the latter prisoner differently. A reasonable jury could conclude that denying Plaintiff's request to grow a full-length beard while allowing other prisoners to grow longer beards violates the Equal Protection Clause.

### b.    Religious Items

Plaintiff has adduced evidence that he was denied the ability to purchase religious items that practitioners of other faiths were allowed to possess, and Defendants have not produced evidence that there is a rational basis for allowing practitioners of other faiths to possess the items Plaintiff requested but not allowing Plaintiff to possess the same or similar items. A reasonable jury could conclude that denying Plaintiff's requests for religious items that prisoners of other faiths are permitted to possess violates the Equal Protection Clause.

### c.    Group Services

Defendants contend that even if other prisoners were treated differently, that alone is insufficient to establish an equal protection violation, because prisons are not obligated to provide identical facilities or services to different faiths. (Doc. 45 at 15.) Rather, Defendants assert, prison officials "must make good faith accommodation of the prisoners' rights considering practical considerations." (*Id.*) Defendants argue that services are established by the Senior Chaplain based on available workforce, including volunteer

1   leaders, and as a result, services for religious groups might be weekly, biweekly, or

2   monthly.  (*Id.*)  Defendants contend that multi-faith services do not occur weekly "due to

3   chaplain availability," and the biweekly multi-faith service provides Plaintiff a reasonable

4   opportunity to practice his religion, "even if other religions meet more frequently with

5   outside volunteers."  (*Id.*)

6        In his Response, Plaintiff argues that Defendants have more favorably treated

7   prisoners who practice non-pagan, faith-based religions.  (Doc. 50 at 6.)  Plaintiff notes

8   that 10-20 Muslim prisoners gather weekly for congregate worship and study services,

9   although they do not have "volunteer leadership," and "almost never have problems with

10  chaplaincy availability to supervise their services."  (*Id.*)  Plaintiff contends that the

11  Odinist/Asatru faith community usually gathers in numbers from 10-25 prisoners for group

12  services, similar to the number of Muslim prisoners who gather weekly, but the Odinists

13  have "had problems with chaplaincy availability," and if a chaplain is unavailable,

14  "[s]ervices are just cancelled."  (*Id.*)

15       Plaintiff has produced evidence that Muslim prisoners are treated differently from

16  Odinist/Asatru practitioners with respect to facilitating and accommodating group services.

17  Defendants have not shown there was a rational basis for assisting Muslim prisoners but

18  not Odinist/Asatru prisoners with group services.  A reasonable jury could conclude that

19  assisting Muslim prisoners with their group services and not assisting Odinist prisoners

20  with their group services violates the Equal Protection Clause of the Fourteenth

21  Amendment.  There are genuine disputes of material fact that preclude entry of summary

22  judgment in favor of Defendants.

23       **D.**    **Qualified Immunity**

24       As noted above, Defendants argue, without support, that they are entitled to

25  qualified immunity as to Plaintiff's claims.  The Court has concluded there are genuine

26  disputes of material fact regarding whether Defendants violated Plaintiff's Fourteenth

27  Amendment equal protection rights.  In 2021, it was clearly established that a prisoner may

28  assert an equal protection claim based on membership in a suspected class, religion is a

suspect class, and differences in treatment between members of a suspect class may violate the Equal Protection Clause. *See Thornton*, 425 F.3d at 1167; *Lee*, 250 F.3d at 686. It was also clearly established that a prisoner could assert a class-of-one equal protection claim by showing he was treated differently from other similarly situated prisoners and that there was no rational basis for the difference in treatment. *See Olech*, 528 U.S. at 564. As with Plaintiff's religious exercise claims, Defendants make no attempt to show these precedents were not clearly established or do not apply to this case. The Court concludes Defendants are not entitled to qualified immunity as to Plaintiff's equal protection claims.

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment as to Plaintiff's Fourteenth Amendment equal protection claims.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 45).

(2)     Defendants' Motion for Summary Judgment (Doc. 45) is **denied as moot** in part and **denied** in part, as follows:

(a)     The Motion is **denied as moot** as to Plaintiff's RLUIPA and First Amendment claim with respect to group services.

(b)     The Motion is **denied** as to Plaintiff's remaining claims.

(3)     Plaintiff's request for money damages under RLUIPA is **dismissed**. Plaintiff's RLUIPA and First Amendment claim with respect to group services is **dismissed**.

(4)     The remaining claims are Plaintiff's claims for injunctive relief under RLUIPA, for money damages under the First Amendment as to growing a full-length beard and requests for religious items, and for money damages under the Equal Protection Clause of the Fourteenth Amendment.

(5)     This action is referred to Magistrate Judge Willett to conduct a settlement conference.

(6)     Defense counsel must arrange for the relevant parties to jointly call

Magistrate Judge Willett's chambers at (602) 322-7620 within 14 days to schedule a date for the settlement conference.

Dated this 25th day of March, 2024.

James A. Teilborg
Senior United States District Judge